Mr. Burns v. Illinois Property Tax Appeal 15-1256 Kevin Dahl, Petitioner v. Illinois Property Tax Appeal Board of Review McAllen County Board of Review McAllen Community School District No. 427, Respondent Ernie Monticello, Appellant Mr. Kevin P. Burke Ernie Monticello, Appellant Mr. Scott L. Gainsburg Mr. Gainsburg, also arguing that the appellant was violently... And it's my understanding that there has been an agreement between Mr. Gainsburg and Ms. Quinn on the... on how they will argue and split that particular time. Yes, madam. All right, fine, thank you. All right, Mr. Burke? May it please the court, my name is Kevin Burk and I'm representing the appellant, Kevin Dahl. And thank you for allowing us to present our arguments today. As you are probably aware from the briefs, this is Mr. Dahl's third appearance before this court in connection with the property taxes on the subject property. This case involves a PTAP, Property Tax Appeal Board, decision for the 2008 and 2009 tax years. The second decision that the Property Tax Appeal Board issued, and the issue is open space. Starting with the 2008 tax year, I think the first question is, did Mr. Dahl waive his right to claim that preferential assessment when he didn't file the application by the statutory deadline, which at that time was January 31st? We admit he didn't file by that date. And what was preventing him from filing by that date? The strategy or he was waiting for something else? I think it was the strategy at that time. 2008 was not a reassessment year. 2007 had been the reassessment year. The 2007 assessment was very small. He thought that the 2008 assessment would be small. By asking for an open space preferential assessment, he would have been asking for an increase. So it wasn't until October of that year when the assessment increase was issued by the county, an increase that brought us taxes from a couple thousand dollars to over a hundred thousand, that we filed the application. And in 2007, the assessment was reflecting the fact that he had farmed the property or had farming going on on the property for the preceding three years or two years? The 2007 assessment, I think, reflected that. There was a belief that he was entitled to the developer's relief. He did not farm it in 2007. He had stopped farming in 2004. Can I ask you a point of question? Do you have any case law that says that the ostensibly mandatory deadline for filing is amenable to a substantial rather than strict compliance analysis? The only case that we found is the Weber case, which was discussed a lot in our brief. It's a very similar case out of the 3rd District. It involved a golf course where there was a change in the parcel numbers. And in that case, the golf course owner did not file for one of the parcel numbers. He didn't even file in the administrative relief because he didn't find out about it until he got the tax bills. But, Justice Hutchins, there's an impediment there that we don't have here. There was some confusion that was not within the control of the appealing party, correct? There was an error apparently in the tax parcel numbers that the property owner had nothing to do with, right? There was a change in the parcel numbers. Right. Here there wasn't that kind of issue or impediment, correct? No, but I would think if you compare the two circumstances, we're dealing with unique circumstances here. If you look at the assessment history of his property over the years, it kept going up, down, up, down. And I realize we're asking this court to carve out an exception. And the statute does say must. I realize that too. But I think under these facts, it would be a narrowest exception. And I think it's justified. There's not going to be any harm to the county or to the PTAP if they're directed to at least entertain his 2008 claim that he was entitled to open space as opposed to say, you didn't file, you're out of the box, you don't need to get your date in court. If you look at the history of the open space statute also, the legislative history, this was a statute that was passed to help property owners avoid a large amount of taxes while they were keeping the property open and vacant. So I think if you take that all together, there is justification here to carve out a narrow exception. And I don't think it's going to open up the floodgates to other taxpayers coming in here and saying, well, we didn't file on time, give us a break. The Webber case was decided in 1993, and we have not seen any appellate court cases where a taxpayer has come in and said, we fit under those same type of unique facts. Ignore that we didn't file on time. Just what you have to say is, and you are saying is, there's some unique compelling circumstances here that would justify an exception to the general rule. Yes. By the same token, if we did not, and I'm not saying we will or we won't, if we did not change the decision of the PTAP for 2009, would there be any reason to then give your client that day in court on 2008 if it's going to be a similar circumstance? The only reason would be that the three years involved for 2008, the three prior years, would be 2005, 6, and 7, where for 2009 it was 6, 7, and 8. But if you, again conceding, if you uphold the PTAP's decision for 2009, more than likely, even if this case was remanded for a third time to PTAP, I wouldn't hold my hopes up. And it would cost your client some additional money. What about 2009? Okay, so 2009, you're dealing again with a statute that is very broad and somewhat generic. It lists six subcategories of what type of property qualifies. None of them have a very rigid or stringent definition. I think if you look at subparagraph C, which is the one I think we most likely fall under, it says promotes conservation of soil. And when they passed the statute, there was a lot of debate. This thing is so broad, almost any type of property could qualify. And if you look at the appellate court decisions, the PTAP decisions we cited, all types of property do qualify. It doesn't have to be neatly manicured lawns. It doesn't have to be a bunch of trees. Lots of different property. And to give you some examples, the PTAP cases, the U.S. Steel case, that was a former steel manufacturing plant. You look at the corporate campuses cases. Those were basically just lawns around the corporate campus. The Michael Siegel case was really his weekend retreat. So we're saying that this statute has been interpreted broadly in the past to allow for all types of property. All right. In 2005, I think, is that when most of the work to accomplish maybe a commercial sale was done where the land was scraped and put in some improvements and things of that nature? Yes. They scraped the top and put in piping. Okay. Did he put in curbs and gutters, or did that not get done? It's not clear from the record. I think the curbs, because this property fronts on the main thoroughfare, I think the curbs were in there already. All right. So let's say that certainly doing the scraping and digging to put in the piping is not necessarily preserving soil. I mean, he's actually scraped it half the way. So if he now comes back subsequently and starts to farm again, and I think his suggestion of why he farmed was because he, or his expert suggestion was he was trying to regenerate that soil. Can he get open space in that way when he did the thing to the soil that required it to be regenerated and fixed? Can he get the distinction? Can he get the break? Yes, I think he can. Because if you look at the testimony of our expert, which was the only person who testified as to these issues, he said there's a number of ways for property to undergo this transformation. One is to just leave it alone, and over time, natural plants will grow. It's hard, though, when it's scraped, isn't it? I mean, it happens, but it's not very organized. Let's put it that way. Well, the next year, 2006, he was able to plant winter wheat, which, again, our expert said that helps hold the soil in place. And our expert said that based upon his review of historic photographs, that in 2007 and 2008, the site was starting to become full of vegetation. So this is something that takes time, and admittedly it's probably not going to be something you would drive by and say, wow, that looks beautiful. But we don't need that under the statute. What the statute was encouraging, instead of building a Walmart or a gas station, keep it open, and the statute, again, I say, says lots of different property will qualify. Well, Bill, let's talk about keep it open. He didn't really intend to keep it open, but by happenstance it ended up that the commercial sale fell through, correct? Yes. His intent, I mean, his intent was to sell it, but intent is not part of the statute. He doesn't have to have it. And this parcel is currently zoned for agriculture or farming, essentially. It hadn't been rezoned for commercial use, had it? I don't know if he ever changed the zoning. It's still being farmed today. I don't know if he ever got the zoning changed. And how big is this parcel? It's about 25 acres. And is the whole thing being farmed or just some of it? It's all receiving farm treatment, so I presume 99% of it is being farmed. The court seemed to have trouble with the fact that Mr. McArdle didn't visit the property. What do you have to say about that? Well, he did visit it once. And I don't think the PTAB or the court brought that up in their decision. What they seem to be, what I read from their decision, was they thought his explanation of the secondary succession was inconsistent with planning winter wheat the one year. It seemed to say that they thought planting that winter wheat in 2006 would have interrupted the secondary succession. But if you read all of his testimony, he explained one way to have secondary succession is you can cultivate plants. He said that would be a minimal interference with the property, which is what happened there. I mean, winter wheat is not an invasive crop. And he said it does hold the soil in place. It prevents downstream water running and other things. Especially after the earlier attempt to transform the property into something that might be commercially desirable. He had to somehow regenerate it. Now, that seems to be implicit in Mr. McArdle's testimony, but did he actually say that? Did he ever say, look, this is what happened when he looked at the historical maps. This is what happened in 2005. If he's going to keep this as open space, he had to do something. No, he did not say that it was necessary to plant the winter wheat. What he did say, though, is that planting winter wheat is not inconsistent with conserving soil. And he was not contradicted on that and wasn't even cross-examined on that. His testimony stands unrefuted. Now, you seem to indicate your strongest argument was under subsection C of the statute. Is there any other subsection specifically you want to call our attention to? Other than what's in your brief. I would say C is our strongest. We did raise other ones in the hearing before the Tax Appeal Board. But I think C is the strongest. To me, it's the most generic or broad provision of the statute. It's the one that's been used, I think, over and over again to provide or I can see why you're hanging your head under that. PTAF felt that he used the land, he didn't use the land to promote conservation of soil where he negatively impacted ecological conservation and growth. What's your response to that? He negatively impacted ecological conservation and growth. What's your response to that? I think what PTAF was referring to, because they kept pointing back to that he planted the winter wheat in 2006, and I don't think that negatively impacted anything. I think that, you know, if you read his whole testimony, he said earlier on that, well, one, he said planting wheat was part of secondary succession. There's lots of ways for secondary succession. You can just leave it totally alone, or you can plant some minimal crops or plants and help it along. So what's our standard of review on these issues here? On this issue, we would say it's de novo that this is a question of law interpreting the statute. But even if you went to manifest weight of the evidence, we believe that when there's only The only evidence was from our witness, our expert, somebody with over 20 years of experience. Barely was cross-examined on any of these topics. Yes, PTAF has, and you have to give deference to PTAF decisions. Presumably they have some expertise in this area, are they not, by law? Yes, but it's not unlimited deference you give to them. And their expertise, I would suggest in most PTAF cases the issue is the value of the property. I don't know if they have that much expertise in how do you go about conserving soil. They're not really trained in that. And yet they had an expert here who said that, and the hearing officer or PTAF said he was incredible. What was incredible about his testimony? And I know that's a key word that makes the manifest weight of the evidence hard, but you can't just say he's not credible. Other than she alluded to, didn't they say something about because he hadn't seen the property, isn't that sort of a legitimate reason to maybe discredit his testimony somewhat? Well, he did see it and he did visit the property, not during these years. But he reviewed historic photographs, which he says he can rely on. I mean, he's an expert, he's allowed to rely on them. How does, I mean, if this was strictly farmland, both counsels seem to say that exclusivity is the key here, that it's not whatever he did didn't exclusively use it for open space. Are there cases that say farmland can be, if it's exclusively farmed, it can be open space? Or wouldn't that make any sense because open space is a higher taxing issue? I would say more the latter. If it was all farmland and you had farmed it for the two years before you got it in year three, you wouldn't ask for open space. And I would agree that not all farmland was being used as open space. It depends upon what type of crop you were planting. But the crop he planted, winter wheat, I think is consistent with open space. I mean, his testimony was part of the reason he planted it was to keep it looking neater and to have something on there growing. Is there any prohibition, and in this case he couldn't sell it because something happened to it, but could he have sold it and still been able to use that farmland exclusivity in your mind? You mean subsequently could he have sold it? Right, I mean, you say sold the wheat, not the library, sold the wheat. I'm assuming he's selling what he can from his farming activities now? Now I presume he is. That year he said the crop didn't take. Right. So he couldn't sell it. It's some sort of disease that caused the problem. Any questions? Thank you, sir. You'll have an opportunity to respond. Mr. Ginsburg seems to be getting his stuff together, so he must be first. I'm first. Good morning, Your Honors. My name is Scott Ginsburg. I represent Sycamore School District Number 427, the respondent in these appeals. You know, I think it's important to take a step back and see how we got to where the taxpayer is in a position where they're left on their open space argument in this case. You know, just doing a little bit of history. In 2004, it's undisputed that the taxpayer was farming the subject property and the assessor had classified the property as farmland. Because he was able to use a certain provision in the law. Right. He was a developer. The real estate developer owned the subject property and continued to farm the subject property to obtain the, we call it favorable assessment, the farmland valuation, which is higher than the commercial value by a significant amount. Excuse me, lower than. Right. By a significant amount. In 2005, the taxpayer stated in the hearing that he neither farmed nor platted the subject property. As he stated, he just let it go. Further evidence revealed that he scraped and graded the subject property. And he was actively taking steps to develop the property to ultimately convert, you know, to sell to someone that would buy residential properties or commercial properties or what have you and develop it into commercial property. In 2005, the assessor, the township assessor testified that he noticed that they ceased farming. He went out to the property, physically viewed the property in accordance with his responsibilities and duties as a township assessor, and concluded that the property was neither farmed nor platted in accordance with the Developer's Relief Act. So he changed the subject property to its classification as vacant commercial land. He did this based on his understanding of the fact that it was being marketed for sale and where the property was located. And then finally, in 2006, the taxpayer received notice that the assessment had been increased from $18,743 to $1,420,696. Now, the taxpayer, again, the developer, determined he received this assessment notice, and it was his determination that he would hire an attorney and file what he called a two-pronged attack, attacking the township assessor, the DeKalb County assessment officials, for increasing his assessment. So here we are, this professional real estate developer going forward with a strategy. The strategy was to challenge the increased assessment with the DeKalb County Board of Review and challenge the increased assessment before the circuit court in DeKalb County by characterizing the property as an exemption and therefore an excuse from exhaustion of administrative remedies. That litigation proceeded until this court reversed the circuit court's decision in September of 2008. Now, the relevance here is that it was only after the taxpayer lost both of those rounds of its strategy that it made the decision to characterize the property as open space. The taxpayer was asked, why didn't you file before? He said because he didn't have any notice that he needed to. He had an attorney that was advising him that this two-pronged strategy was going to work. It was when that strategy didn't work, that's when he had notice that he needed to do something else. At that point, though, he missed the deadline for 2008. So it was too late for him to file for 2008. And as far as the 2006, 2009, well, he'd been planting winter weed on the subject property in 2006. And there's testimony that the property had been disturbed in 2006. In essence, all the action, all the testimony regarding what happened to the property during this period of when open space would have been relevant was inconsistent with an open space use. The taxpayer renamed the property Towns and Woods Commercial Subdivision. They scraped and graded the property and removed the topsoil. They'd installed piping and did more development of the land, installed sewer lines, water lines. As noted, McArdle testified that in 2006, not only was the property farmed, but the property was disturbed, which in my opinion, you know, would mean that it's the opposite of conserved. It was disturbed. But that disturbance, if I also read what happened correctly, he couldn't have just gone in there and planted unscraped and graded soil. He needed to prepare it for planting, which would then bring up more soil, which couldn't blow away unless it was conserved by this winter weed, which is a strategic crop in the farming community. So didn't he fix what he had? Essentially, didn't he fix the disturbance that he had created earlier? The record is not clear. This was not a well-developed argument by the taxpayer at the hearing. Mr. McArdle, the expert, simply stated that the property had been disturbed in 2006, and he also testified that winter weed had been planted and winter weed doesn't necessarily ñ winter weed can't conserve the property. There was never any connection in the testimony of Mr. McArdle that the disturbance and the planting were related. It was sort of all jumbled together. Can't we draw that inference, though? I'm sorry? Can't we draw that inference from his testimony? I don't know, because there was a lot going on in the property. They were continuing to develop the property. They were installing sewer lines on the north part of the property. There was water retention, man-made water retention ponds that were going on. There was a plan of subdivision filed around this in late 2007. So there was a lot going on in this property. With regard to the winter weed, as counsel alludes, wasn't his testimony substantially unchallenged, uncontradicted about the purpose of the winter weed? The experts? Yeah. Well, it's an interesting question, because the experts' testimony was rejected by the PTAB, and it's one of the reasons ñ But there was no contrary evidence, correct? There was no contrary evidence, but there was also no notice before the hearing that this was going to be the subject of the expert's testimony. Prior to the hearing, a witness list were exchanged, and the expert's testimony was going to be the benefits of allowing the property to remain fallow. And so when the expert came in without a report, without any ñ you know, any notice of what ñ the only notice to any party is that the property was going to remain fallow, and he was going to testify how that benefits. And then he came in and testified to the planning of winter weed. You know, it's a certain ñ there's no discovery in these cases. It's difficult to imagine how you're supposed to dispute that fact. You know, we're not experts on ñ we can only prepare for what we know is going to come at a hearing. So, yes, there was no contradictory evidence. On the other hand ñ I have never known an attorney who didn't want to ask a question. So couldn't there have been some questions about this issue? As to the ñ You know, how ñ you know, you said it was going to be fallow, or our understanding was that you were going to testify about the fact that this was a fallow. Now you're saying winter weed. How does winter weed do it, and what's the purpose? Is there any ñ are there any sciences going with it? I mean, those things were all subject to cross-examination, weren't they? They were subject ñ that's true. And the PTAC found in total that, based upon what the experts stated, the testimony regarding the winter weeds as conserving the soil was incredible. And, you know, when you take the totality of the experts' testimony, the fact that he only looked at pictures from the second half of the summer of 2006, the summer of 2007, summer of 2008, he never did a soil test, he never visited the property until prior to the hearing, he wasn't disclosed as the subject of his testimony. You know, the totality of it gives the PTAC plenty of room to say that this just doesn't, you know, in total pass the credibility test, and that's what it did. As far as the argument that the taxpayer had no reason to think the assessment would be changed for 2008 on the deadline requirement, you've got to remember that, pursuant to the testimony, and this was an important fact in the prior decision of this court, the developer's relief decision, is that at the time of the 2008 assessment, the property had been classified as commercial or non-farm land. The only reason the assessment was a low number, as the taxpayer characterizes it, was because of the circuit court decision finding that the property had received an exemption, which this court subsequently reversed. So the idea that there was no notice is contradicted by the record where the property record cards show that the property had been classified differently and there was only a lower assessment because of a court decision. At that point, you know, the actions of the taxpayer are consistent with somebody who didn't know that their assessment could be changed. You know, they filed a plan of subdivision during this time to freeze the assessment under the developer's relief statutes. They also planted the winter weeds. You know, they did that because they wanted to address the farming deal of it. So this isn't the actions of a taxpayer who is certain of what its assessment stats would be. This is the actions of a taxpayer who's actively engaged in executing a strategy that they thought would go one way that happened to go the other way and then retroactively coming up with an argument on open space. In terms of the deadline, counsel points to the golf course case. It's basically indicating or establishing that there can be, there can be some exceptions to the mandatory deadline. What's your response to his citing to the golf course case? Well, I think the operative words in the Weber case were that the court found that, and this is a quote, the objector complied with the law to the greatest extent possible to obtain its open space valuation for 1990, end of quote, which is the year in question. And here, there's, you know, they actively didn't comply with the law. They were going with another law. They were trying for developer's relief. They did nothing to comply with the law. They didn't file the application. In Weber, they filed the application. The record stated, in that case, stated that the mapping department was the one that changed the pin after the assessments had been set, and the mapping department had no connection with the assessment department, so there was no communication. So there were certain circumstances beyond the control of the property owner saying it didn't exist here? Exactly. Okay. Thank you very much, Your Honor. Thank you, sir. Ms. Quinn. May it please the Court. Your Honor, open space assessment is not a placeholder status for property that's going to be flipped for a more profitable use. The General Assembly has long been concerned with the disappearance of our open space in Illinois, and therefore, it enacted provisions to encourage property owners to use their property as open space, first with a carrot by giving you favorable tax assessment if you use your property that way, and secondly, there's a bit of a stick involved because the rollback provision, which is Section 10-165, provides that if an owner who has open space status later decides to change his use of the property to something more profitable, the owner is then going to have to go back through years and pay the county the difference between the lower open space assessment and the fair cash value assessment, which is still on the books. Well, and it makes sense because upon the sale, he actually, or the developer actually has the funds to do that, and it can be done, but here we have no subsequent sale. You would still, or not you, but the taxpayers would still get that developer money if this was open space and it was subsequently sold. I think the problem here is, and that's where I'm a little confused, the commercial development essentially occurred in 2005. That's where all the engraving and the scraping and some of that. I mean, it went on. We had platting in 2007 to try to get that developer relief statute, but when it didn't get sold through no fault of the taxpayer or the PTAP, why couldn't the developer go back to the open space by trying to correct some of the issues to the property, putting the wheat, retaining the soil, putting in some retention, because why couldn't they do that and still retain or still, in this case, get open space classification? Well, in 2006, the taxpayer apparently made the decision to go back to trying to obtain a farmland classification, and that was his reason for planting the winter wheat. Well, instead, he wanted the farming deal, but realistically, knowing that wasn't going to happen, why can't he switch his strategy to open space using farming to preserve the soil? Well, he was going for farmland, and if farmland were open space, if it were the same as open space, that would essentially read the farmland classification right out of the statute as mere surplusage. Also, there's no rollback provision. Nobody would get farmland classification that's going to ask for open space because it's going to cost them more money. So now he's going to open space because farmland isn't going to work. He's thinking maybe it would, but he knows realistically it won't. So now he's conserving the soil. Why can't he do that? Well, he wasn't going for it at the time. He didn't decide to switch his strategy to looking for open space until the end of 2008 when he received his unfavorable decisions. Does it matter what his strategy is, or does it matter what he did? Well, we have this one line of testimony from the expert, Mr. McArdle, saying, Oh, yeah, I could conserve the soil, but it's at the end of his testimony. It's almost an afterthought at that point. And the Tax Appeal Board, in light of the other testimony about the length of time for plant succession and the fact that you can't even start to have this revegetation until the disturbances cease, and the disturbances didn't cease until after 2006. There is testimony. It was disturbed then. With all that, the Tax Appeal Board did not find that testimony credible. A fact finder can accept some, none, or all, obviously, of a witness's testimony, and that is so even if a witness is the only one to testify on a particular subject. But by rejecting open space, it appears he's gone back to farmland, and I don't know if he's still appealing, but now if he is farmland, he's paying less. If he's farming, it's the use of your property that drives your classification. So if he's using it for farmland, and in fact, he testified and the assessor both testified that despite the fact that he timely applied for open space for 2009, he also started farming it again in 2009 because by July of that year, there was a crop on it. Well, again, I ask the question. I don't think there's anything, any case that says a farmland classification violates the exclusivity of use that could be open space, but why would anybody ask for open space if they can get farmland classification? They're going to pay less. He didn't have his preferential treatment at the time, and so this was his afterthought, secondary strategy. And you're honest, correct? There aren't any cases that say that open space and farmland are the same thing. But there aren't any that say they aren't the same thing either. But you have them in different sections of the Act. What's the difference between fallow farmland and open space? Fallow farmland is going to be further farmed. We can't look at the future. Looking at a plot of land, what is the difference between fallow farmland and open space? Open space, well, there's a number of types of uses of open space in the statute. I'm trying to think of the definition of the word fallow.  If you were given, and this is the odd thing, because of the rollback provision, he started farming it again in 2009. I'm trying to figure out how you would, even if he got open space classification for 2009, he changed the use that year, and he's farmed it every year since. So he would effectively get no relief, even if he were granted open space status for that one year. Because once you change your use, you recapture whatever the difference was between the fair cash value assessment and whatever the open space was. And there is no rollback for farmland. It's there for open space, but not for farmland. But maybe this is a question better placed to the school district. If he's going to go back to farmland and actually use it for farmland, why would they object to open space? Because they could make more money on open space than farmland. I mean, they would get more tax benefit on open space than they would on farmland. But if he's using it for farmland, I mean, as I say, it's the use that drives the classification honors. We would urge that the PTAB's decision stand. Thank you. Mr. Burke. Back to the question of disturbing the land and looking at the expert's testimony on page 36 of the record. Talks about several different types of secondary succession. And he says one, quote, Then there's cultivated areas, which is a type of disturbance. That's what we had in 2006. They cultivated winter wheat. Yes, it would be some disturbance, but that works under the expert's theory. We keep hearing that, you know, my client was some big developer or had this intent to sell the property and didn't really want to keep it as open space. None of that is relevant. As I said before, you don't have to, in order to get this preferential assessment, you don't have to be doing this to serve the public good. As was just discussed, if you sold the property, one, you have to keep it as open space three years before you even get the benefit. And then once you sell it or change it, there's a three-year rollback. So that's six years you have to keep it as open space at a minimum before you get any benefit. So, yes, if he was trying to sell it, that doesn't mean he doesn't get it. We're not looking into his mind or his thought process. The question is, what was the property doing? And if he does sell it, they can get some of that value back from the proceeds. Right. So they haven't lost anything. No, they haven't lost anything. The only one who's lost anything is Mr. Dahl, who saw his assessment and his taxes go from $1,000 to $100,000. And he's still sitting on this property. Are there any other cases out there? I mean, with real estate as it is these days, do you think there would be something else out there that might show us other remedies that PTAP has done in this type of property? Well, the only other case that I can think of of what they've done, and the case kept bouncing back and forth, was on Wencia with the problem that all golf courses are having now. PTAP first went very broad and said that the clubhouse comes off the rolls. And then the appellate court in this district said we didn't mean that, that the clubhouse has to pay some taxes. I mean, I think – But golf courses have special mention. Yes. So they kind of stick out. But farmland, open space, commercial, I'm just trying to figure out if there is a prohibition. If you've started something and it didn't work, the use of the land, and you go to a different use, it seems to, under the PTAP decision, preclude you from getting additional or the new classification. And I don't understand why. And I don't either. I think his strategy is really not relevant. I mean, he probably didn't have a strategy. But if he can take advantage of the statute that we have, why shouldn't he be allowed to? I mean, as I said, I don't think he went into this thinking – obviously he didn't go into this thinking he'd still be owning this land. But I think under the statute, and the U.S. Steel case is a perfect example out of PTAP, U.S. Steel is not sitting on their land thinking that if we leave it there, it's going to start being natural weeds and we'll sit on it forever. They want to sell that eventually, I would think. And when they do, there will be a rollback. And I think that's the situation we have here for Mr. Dahl. So I would think, at a minimum, he should get it for 2009. And I understand – And PTAP doesn't really care what the property looks like, do they? No. That's never a consideration. The neighbors might, but PTAP doesn't. No. Okay. Well, thank you. If there's any other questions, I'll go. Thank you. Thank you all today for your argument. It was interesting, and we will take it under advisement and render a decision in due course. We will stand in recess at this time.